859 P.2d 1023 (1993)
Richard Allen CANAPE, Appellant,
v.
The STATE of Nevada, Respondent.
No. 20461.
Supreme Court of Nevada.
September 9, 1993.
*1024 Morgan D. Harris, Public Defender, Susan Deems Roske, and Stephen J. Dahl, Deputies, Clark County, for appellant.
Frankie Sue Del Papa, Atty. Gen., Carson City, Rex Bell, Dist. Atty., James Tufteland, Chief Deputy, and Daniel M. Seaton, Deputy, Clark County, for respondent.

OPINION
YOUNG, Justice.
A jury convicted appellant Richard Allen Canape of murder in the first degree and armed robbery of the murder victim. Canape was sentenced to death. For the reasons set forth below, we affirm the convictions and the death sentence.

FACTS
On October 4, 1988, Manuel Toledo, a New Jersey resident, arrived in Las Vegas to go on a hunting trip in southern Utah. Toledo's wife testified that her husband always carried two wallets on his hunting trips: a large wallet containing credit cards, identification, and spending cash; and a smaller wallet containing additional cash for emergency purposes. She testified that she helped her husband pack for the October 1988 trip and that he had both wallets when he left New Jersey.
After arriving in Las Vegas, Toledo rented a car and, several hours later, phoned *1025 his wife to inform her that he had arrived in Cedar City, Utah. On October 6, 1988, Toledo again called his wife to tell her that he had bagged an elk and would drive back to Las Vegas to catch a late flight home. Toledo left Cedar City and proceeded toward Las Vegas on Interstate Highway 15. He apparently ran out of gas about ten miles north of Las Vegas. At approximately 9:20 p.m., Toledo entered an AM-PM Mini-Mart a few blocks off I-15. The cashier at the AM-PM testified that Toledo filled two gas cans and that she loaned him a third can which he also filled. Toledo told the cashier that someone waiting outside was going to drive him back to his car. The cashier looked out the window and saw Toledo get into a car driven by a black male with sideburns. The driver wore a white hat.
On October 7, 1988, Robert Jiminez was driving on I-15 toward Las Vegas when his car developed a vapor lock. He coasted to a stop behind another vehicle parked on the roadside. Jiminez got out of his vehicle and checked under its hood. He noticed debris scattered around the other vehicle, including gas cans, a pair of eye glasses, some twine and a watch. As Jiminez walked back to his car, he saw Toledo's body lying down an embankment from the highway. He flagged down a passing motorist who contacted the police. While waiting for the police to arrive, Jiminez noticed a white hat lying on the ground halfway between the car and the body.
Examination of Toledo's body revealed that he died from two gunshot wounds fired from a nine-millimeter weapon. Authorities found two shell casings near the body. When the police removed the body, they recovered a spent bullet which had passed through the victim's head and lay on the ground underneath the body. Police found a white hat almost in a direct line between the car and the body, about halfway down the embankment. Examination of Toledo's person revealed one wallet containing $1,400, but no driver's license, credit cards or other identification. Toledo's other wallet, the larger one in which his wife stated he carried his credit cards, identification, and spending cash was missing and never recovered.
Seventeen days after the Toledo murder, police arrested Canape for attempted armed robbery of a liquor store in Las Vegas. At the time of his arrest, Canape possessed a nine-millimeter, semi-automatic pistol. A Las Vegas Metro Police Department weapons expert examined the gun. The weapons expert compared shell casings and bullets from test firing the gun to the shell casings found at the murder scene and the bullet found under the victim's head. The weapons expert positively concluded that the nine-millimeter pistol was the weapon used to kill Manuel Toledo.
Following his arrest for the liquor store robbery, police towed Canape's car to their impound lot. The cashier from the AM-PM store where Toledo filled his gas cans viewed Canape's car and told the police that it looked similar to the car in which Toledo rode away on the night of his murder. The cashier also stated that the hat found at the murder scene looked similar to the one the car's driver wore on the night he drove away with Toledo.
Canape was charged with the murder and robbery of Manuel Toledo. At trial, Mrs. Toledo testified to the circumstances of her husband's hunting trips to Utah, by way of Las Vegas. She also recounted that her husband always carried two wallets. She stated that the hat found at the murder site did not belong to her husband and that she had never seen it before.
A search of Canape's car following his robbery arrest uncovered a photograph album containing pictures of Canape. In one of these photos, Canape is pictured wearing a white hat similar to the one found at the murder scene. The cashier from the AM-PM testified that the man in the photo resembled the man with whom Toledo rode away on the night of the murder.
The search of Canape's car also revealed a length of twine. A hair and fiber analyst testified that the twine from Canape's vehicle was, within scientific certainty, the same type as that found at the crime scene. The same expert testified that hair samples *1026 taken from Canape were similar to hair found in the hat recovered at the murder scene.
The jury found Canape guilty of murder with a deadly weapon while in the commission of a robbery. He was also convicted of the robbery as a separate offense. In the penalty phase, the State presented evidence of four aggravating circumstances. The State offered evidence that Canape had a five-year sentence for a 1983 felony conviction in Hawaii. The defense did not present any mitigating evidence, electing instead to dispute the evidence supporting the aggravating factors. Canape received a death sentence.

DISCUSSION
On appeal Canape argues that (1) the State presented insufficient evidence concerning robbery, and the trial court erred in its instructions to the jury regarding this crime; (2) the failure to provide a complete record on appeal amounted to a denial of Canape's right to due process; (3) prosecutorial misconduct deprived Canape of a fair penalty hearing; (4) the court erred in its reasonable doubt jury instruction; (5) requiring Canape to wear shackles during the penalty phase violated his constitutional rights; and (6) the trial court erred in its instruction to the jury regarding aggravating circumstances.
We hold that all of Canape's contentions are without merit.

I. Sufficiency of evidence of robbery.

Canape first contends that the State presented insufficient evidence to support instructing the jury on robbery, both as a separate offense and as a basis for invoking the felony murder doctrine. The standard of review for sufficiency of evidence upon appeal "is not whether this court is convinced of the defendant's guilt beyond a reasonable doubt, but whether the jury, acting reasonably, could be convinced to that certitude by evidence it had a right to accept." Edwards v. State, 90 Nev. 255, 258-259, 524 P.2d 328, 331 (1974).
Canape points out that the cashier from the AM-PM was the only person other than the killer who had contact with Toledo before his death after the victim left Utah to return to Las Vegas. Canape argues that the State presented no proof that Toledo carried his second wallet at the time of his death and presented no evidence that Toledo paid for gas with a credit card. Canape also points out that the victim had over $1,400 on his person, that his watch was not taken, that his luggage sat undisturbed, and that his hunting rifle lay untouched in the rental car's trunk. From these facts, Canape asserts that the State failed to establish robbery as a basis for Toledo's death. He argues that any theory on the fate of Toledo's other wallet is necessarily speculative: there was no evidence that Toledo possessed the second wallet on the day of his death.
We acknowledge that evidence of robbery in this case was entirely circumstantial. However, we have long recognized that circumstantial evidence may constitute the sole basis for a conviction. Deveroux v. State, 96 Nev. 388, 391, 610 P.2d 722, 724 (1980). In support of the robbery theory, the State adduced the following evidence: (1) Toledo normally carried two wallets, a large one and a small one, but only the small wallet was found; (2) the large wallet, containing Toledo's credit cards and identification, was never found; (3) the large wallet also contained Toledo's spending cash; (4) shortly before his death, Toledo purchased two one-gallon gas cans from a 7-11 market and borrowed a third gas can from the cashier at a nearby AM-PM market, where Toledo purchased and paid for gas; (5) no change from the purchase of the gas cans nor gas was found with Toledo's other personal property near his car or on his body; (6) the small wallet with $1,400 which Toledo kept for an emergency was found on his body in a pants pocket, apparently overlooked by his killer; (7) when Toledo purchased the gas, the cashier from AM-PM testified that Toledo pointed to a car with a black man wearing a white hat who Toledo said was going to take the gas and Toledo back to his vehicle; (8) the cashier testified that when Toledo pointed *1027 to the car, the driver slid down in the seat and pulled a white hat over his face; (9) the cashier further testified that the picture of Canape in a white hat found in his photograph album looked similar to the "image I have of the person whom I saw in the car"; (10) police found evidence of a struggle on the ground by Toledo's car; (11) two of the gas cans had been emptied into Toledo's car, but the third can still contained some gas and there was evidence of spilled gas beneath the gas tank; (12) on the ground near the back of Toledo's car, the police found the victim's property including his wristwatch with a damaged wrist band, his glasses, a black comb, and other personal items; (13) among items on the ground by the car was a piece of plastic twine about four millimeters in diameter stained with what appeared to be several drops of blood and which was identical to twine found several weeks later in Canape's vehicle; (14) authorities observed several drops of blood on pebbles on the ground near Toledo's personal property; (15) the pathologist testified that in addition to two bullet wounds in Toledo's body caused by bullets from Canape's pistol, the victim's body contained other indications of trauma, namely, a dark triangular spot on the left eyebrow with a laceration approximately three-quarters of an inch long which would have bled, a blunt laceration on the right side of his face, bruises on the upper and lower lips, and an abrasion on the left elbow; and (16) the keys to the victim's rental car were never found.
A jury, acting reasonably, could conclude beyond a reasonable doubt that Toledo was robbed prior to his death. Indeed, Canape's counsel admitted in argument to the jury during the guilt phase, "The obvious motive in this case was robbery." Later, he conceded in the penalty phase argument that the robbery at the time of Toledo's death "had been proved beyond a reasonable doubt."
We hold that the evidence was sufficient for a reasonable jury to conclude beyond a reasonable doubt that Canape robbed Toledo prior to his death. Accordingly, we find no error in the trial court's instruction to the jury on robbery as a separate offense and as a basis for the felony murder doctrine.

II. Sufficiency of record on appeal.

Portions of the record on appeal in this case are missing, namely, the transcripts of the proceedings following defense counsel's closing argument, including the State's rebuttal closing argument and the reading of the verdict. Canape contends that the State's failure to provide him with a complete record of the proceedings below violates due process.
On April 15, 1990, Canape's counsel filed an affidavit with this court stating that the record was incomplete and, therefore, this court should remand this case for a new penalty hearing. In an order dated May 8, 1990, this court stated that Nevada Rule of Appellate Procedure (NRAP) 10(c), allowing supplementation of the record by permission of the court, provided the proper means of dealing with the problem. On June 14, 1990, Canape filed a supplementation of record pursuant to NRAP 10(c) containing an affidavit of trial counsel reconstructing what occurred during the proceedings that should have been reported in the missing portion of the transcript. On September 27, 1990, this court filed an additional order stating that Canape had properly supplemented the record.
Respondent argues that Canape is estopped from objecting to the form of the record because he was given full opportunity to cure any defects in the record by way of this court's NRAP 10(c) order. We agree with respondent's argument. In addition, we do not believe Canape suffered prejudice from the omissions from the record, as his counsel did not lodge any objections in the missing portion of the record (the State's rebuttal closing argument). Instead, all of the alleged prosecutorial misconduct, discussed below, occurred either in voir dire or in the opening statement of the penalty phase hearing. See State v. Miller, 40 Wash.App. 483, 698 P.2d 1123 (1985).

*1028 III. Prosecutorial misconduct.

Canape also contends that the prosecution made a number of improper and prejudicial remarks to the jury during the trial and at the sentencing hearing. A review of the record reveals that Canape failed to object to the prosecutor's alleged improper remarks during either the guilt or penalty phases. Thus, we hold that Canape's failure to object to these statements precludes consideration of this alleged misconduct on appeal. Watkins v. State, 93 Nev. 100, 102, 560 P.2d 921, 922 (1977).

IV. Reasonable doubt instruction.

Canape next contends that the trial court's instruction on reasonable doubt violated his right to due process.[1] The instruction in question was based upon NRS 175.211(1). We previously upheld the constitutionality of NRS 175.211(1) and its use as a jury instruction in Brimmage v. State, 93 Nev. 434, 442-443, 567 P.2d 54, 59 (1977), and Cutler v. State, 93 Nev. 329, 336, 566 P.2d 809, 813-814 (1977).
Canape's challenge to the instruction is based upon Cage v. Louisiana, 498 U.S. 39, 40-41, 111 S.Ct. 328, 329-330, 112 L.Ed.2d 339 (1990), wherein the Supreme Court held that a reasonable doubt instruction employed at trial, taken "as a whole," might have confused and misled the jury. A challenge to the Nevada reasonable doubt instruction, premised on the Cage decision, was recently mounted in Lord v. State, 107 Nev. 28, 806 P.2d 548 (1991). In Lord, we upheld the validity of the NRS 175.211 instruction after finding that it was clearly distinguishable from the instruction invalidated in Cage. Lord, 107 Nev. at 40, 806 P.2d at 556. We reach the same conclusion here and find that Canape's contention is without merit.

V. Canape's appearance in shackles before the jury.

Before the start of the penalty phase of Canape's trial and outside the presence of the jury, the prosecutor pointed out to the court that Canape was not shackled. The prosecutor argued that Canape had just been convicted of first degree murder and represented a safety and flight risk. Defense counsel argued that Canape gave no indication of being a safety risk or of fleeing. The court acknowledged this, but nevertheless ordered Canape's feet shackled.
Canape argues that this order violated the Fifth, Sixth, Eighth and Fourteenth Amendments. He cites Estelle v. Williams, 425 U.S. 501, 504-505, 96 S.Ct. 1691, 1693-1694, 48 L.Ed.2d 126 (1976), holding that a state cannot, consistent with due process and equal protection guarantees, compel an accused to stand trial while wearing identifiable prison clothing. Canape also cites Grooms v. State, 96 Nev. 142, 144, 605 P.2d 1145, 1146 (1980), wherein this court held that a criminal defendant has the right to appear before a jury clad in normal clothing without visible restraints: "When such error has occurred [permitting the jury to view defendant in handcuffs], it is our duty to reverse a conviction unless it is clear that the defendant was not prejudiced thereby." Id.
We addressed the issue of whether a defendant may be shackled during a penalty proceeding in Duckett v. State, 104 Nev. 6, 11, 752 P.2d 752, 755 (1988), and held that a defendant's constitutional right to appear before a jury free of prison clothing and restraints no longer exists at a penalty hearing because public safety concerns are accorded greater significance once a jury returns a finding of guilt. Decisions regarding the physical restraint of a defendant at the penalty stage are left to the discretion of the trial court after it has balanced public safety concerns against the potential for prejudice to the defendant. *1029 We will not disturb this decision on appeal absent an abuse of discretion. Id.
We hereby ratify our conclusion in Duckett and hold that no violation of Canape's constitutional rights occurred when he appeared before the jury in shackles at the penalty hearing.

VI. Aggravating circumstance instructions.

The trial court gave Instruction No. 7 informing the jury of circumstances by which the first degree murder could be aggravated.[2]
A. In the instant case, the first circumstance related to murder committed by a person previously convicted of a violent felony, NRS 200.033(3). This circumstance is not challenged on appeal. The prosecution introduced into evidence a certified copy of a judgment of conviction of Canape for armed robbery in Las Vegas, committed seventeen days after the murder of Toledo.
B. The second circumstance was that the murder occurred "in the commission or attempt to commit a robbery." NRS 200.033(4). Canape argues that (1) there was insufficient evidence to prove that Toledo was robbed prior to his death; and (2) the court erred in instructing the jury that it could consider robbery as an aggravating circumstance. During oral argument during the guilt phase, Canape's counsel stated, "The obvious motive was robbery."
At this point in the opinion, it is not necessary to marshal again all the evidence supporting the robbery theory. The following evidence, however, is worthy of reemphasis: (1) the gun taken from Canape at the time of his arrest for armed robbery in Las Vegas seventeen days later, after Toledo's murder, fired the fatal bullets; (2) twine found on the disturbed ground near Toledo's car matched twine taken from Canape's vehicle after his arrest; (3) a white hat found near Toledo's body looked similar to the hat worn by Canape in his photograph album; (4) all fifty-six hairs in the white hat matched the unusual characteristics of Canape's hair samples; (5) the clerk at the AM-PM market where Toledo purchased gas testified that the man with the white hat shown in the photograph was similar to the "image" of the black man driving the car in which Toledo was a passenger shortly before he was murdered; and (6) Canape's counsel admitted in argument in the guilt phase that "[t]he obvious motive was robbery."
Accordingly, we hold that sufficient evidence was presented in the penalty phase to support beyond a reasonable doubt the jury's conclusion that Canape was guilty of murder while engaged in the commission of or attempt to commit robbery.
C. The jury was also instructed that a murder committed to avoid or prevent a lawful arrest (NRS 200.033(5)) constituted an aggravating circumstance. Canape argues that the court improperly instructed the jury on this issue. He cites Jimenez v. State, 105 Nev. 337, 775 P.2d 694 (1989), wherein this court reversed the penalty portion of appellant's conviction after finding that there was no factual basis for concluding that the appellant murdered the victim to prevent or avoid lawful arrest. Id. at 343, 775 P.2d at 698.
The facts in Jimenez are clearly distinguishable from those in the instant case. In that case, the two victims were found in a bar the day after it had been robbed. There was no evidence indicating that they were killed while appellant attempted to flee or that appellant killed to avoid arrest.
*1030 In the case at bar, we hold adequate evidence supported the conclusion that Canape sought to prevent the victim from identifying him as the robber. The evidence showed that at the AM-PM market, the store clerk loaned Toledo a gas can. Toledo and the clerk discussed the method of the can's return. Toledo pointed to Canape's car and indicated that the driver would transport him back to Toledo's vehicle. The clerk testified that when Toledo pointed to the car, Canape pulled a white hat (similar to the one shown in his photograph album) over his face and slid down in the seat.
Canape presumably had good reason to be apprehensive about the threat Toledo posed if he lived. They rode together in the car. Toledo had heard Canape talk and presumably could identify him. Canape drove an old car with a Hawaii license plate. On returning to the Toledo vehicle, which apparently had its emergency lights activated,[3] the unsuspecting victim presumably emptied two cans of gas into his rental car and started to put the contents of the third can into the tank. The jury could reasonably infer that at this point, Toledo was interrupted, and the interruption caused a sizeable gas spill on the ground beneath the tank.
Near the gas cans, where it appears a violent struggle occurred, Toledo's glasses and comb lay on the ground along with other personal property, as if Toledo's pockets had been emptied. Police never located Toledo's car keys. Toledo's large wallet with identification, credit cards and spending cash was presumably taken at this time and never found. The victim's wristwatch with a damaged wrist band was found on the ground, apparently torn from his wrist during the confrontation.
The pathologist testified that the lacerations on Toledo's face would have bled. Drops of blood on the pebbles and on the twine presumably came from trauma to the victim's face. Someone facing Toledo, as in a struggle, caused the bruises and lacerations.[4]
The jury could reasonably infer from the evidence that after the robbery, the victim ran or was forced to walk away from the I-15 freeway. Another ground disturbance was observed forty-six feet from the first disturbance. At this point, authorities found Canape's white hat. The victim's body lay twenty-four feet farther on.
Toledo was shot in the back about twelve inches below the base of the skull. The pathologist testified that his spinal cord was severed by the bullet which then struck the aorta of the heart. A shell casing from the murder weapon was found between the victim's spreadeagled legs. A second bullet was fired with the gun in contact with the victim's skull.
When killed, Toledo was clearly moving away from his car. The jury could reasonably infer that the robbery had already occurred some seventy feet away back near the car and that Canape, seeking to avoid arrest and prosecution, brutally shot Toledo in the back.
In Cavanaugh v. State, 102 Nev. 478, 729 P.2d 481 (1986), we held that it was unnecessary that arrest be imminent, and where the appellant clearly murdered the victim to avoid arrest, no more is required under the statute.
Accordingly, we hold that sufficient evidence existed to justify the court giving that portion of Instruction No. 7 which states that an aggravating circumstance exists when a murder is committed for the purpose of avoiding or preventing a lawful arrest.
Canape next alleges that the court erroneously instructed the jury on depravity of mind as an aggravating circumstance. The court gave Instruction No. 8, which reads as follows:
The condition of mind described as depravity of mind is characterized by an *1031 inherent deficiency of moral sense and rectitude. It consists of evil, corrupt and perverted intent which is devoid of regard for human dignity and which is indifferent to human life. It is a state of mind outrageously, wantonly vile, horrible or inhuman.
In Godfrey v. Georgia, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980), the Supreme Court requires jurisdictions imposing the death penalty to "channel the sentencer's discretion by `clear and objective standards' that provide `specific and detailed guidance,' and that `make rationally reviewable the process for imposing a sentence of death.'" In Robins v. State, 106 Nev. 611, 629, 798 P.2d 558, 570 (1990), this court said,
[W]e construe the instruction [identical to Instruction No. 8] and the statute (NRS 200.033(8)) upon which it is based as requiring torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself, as a qualifying requirement to an aggravating circumstance based in part upon depravity of mind.
The State asserts that this murder falls within the Robins parameters and that accordingly the court properly instructed on depravity of mind. See Rogers v. State, 101 Nev. 457, 705 P.2d 664 (1985), cert. denied, 476 U.S. 1130, 106 S.Ct. 1999, 90 L.Ed.2d 679 (1986). In reply, Canape contends that the instruction was error because the victim died almost immediately and either shot would have been fatal by itself.
As Justice Kennedy stated in Neuschafer v. Whitley, 816 F.2d 1390, 1393 (9th Cir.1987), where a similar issue emerged:
We need not address [the depravity of mind] contention, however, for it would be of no avail to the petitioner. The jury found additional and specific aggravating factors which, under both Nevada law and controlling constitutional principles, justify imposition of the capital sentence.
Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), undergirds the holding in Deutscher v. Whitley, 884 F.2d 1152 (9th Cir.1989), which considered the same Nevada statutory language as the case at bar. In Deutscher, counsel argued for a new trial contending that the statutory language regarding depravity of mind was unconstitutionally vague. The court stated:
Because the jury found two aggravating circumstances besides the torture, depravity of mind, or mutilation circumstance... Neuschafer v. Whitley, 816 F.2d 1390, 1393 (9th Cir.1987) (citing Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)), would require affirmance as to this issue had we not decided to reverse on the basis of Deutscher's ineffective assistance claim.
Deutscher, 884 F.2d at 1163.
In line with this reasoning, we find it unnecessary to reach the merits of this issue in the present case.[5] Rather, under Clemons, we elect to reweigh the three valid aggravating circumstances against evidence of mitigating circumstances.[6]

VII. Determining death eligibility.

For guidance to the jury in determining the punishment in the instant case, the trial court gave Instructions Nos. 4, 5 *1032 and 6.[7] The prosecuting attorney devoted considerable time to explaining to the jury its responsibilities. He clearly stated that the jury could not impose the death penalty unless the jury found at least one aggravating circumstance established beyond a reasonable doubt and further that no mitigating circumstances existed sufficient to outweigh the aggravating circumstance or circumstances found.[8]
The court considered mitigating Instructions Nos. 10 and 10A.[9] Canape's counsel objected to the giving of Instruction 10A on the ground that he felt it would allow the prosecutor to take each of the circumstances in turn and argue that no evidence supported it. A careful review of the record indicates that Canape's counsel did not present evidence of any kind on behalf of Canape at either the guilt or penalty phase.
In Deutscher v. Whitley, 991 F.2d 605, 606-07 (9th Cir.1993), the court stated on remand from the United States Supreme Court that in Nevada, which is a "weighing state," the procedure is as follows:
A Nevada sentencer must consider and weigh both mitigating and aggravating circumstances before it can determine whether a defendant is eligible for the death penalty. The statute provides:

*1033 Every person convicted of murder of the first degree shall be punished: (a) By death, only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances.
Nev.Rev.Stat.Ann. § 200.030(4)(a) (1992) (emphasis supplied).
The jury or the panel of judges may impose a sentence of death only if it finds at least one aggravating circumstance and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.
Under Clemons, we affirm Canape's death sentence. Because the Clemons decision will have a major impact upon this court's future disposition of appeals challenging the death penalty where a defendant raises a question regarding the validity of an aggravating circumstance, we believe some discussion is warranted.[10]
The Mississippi death penalty statute at issue in Clemons, like NRS 200.030(4), requires the weighing of aggravating and mitigating circumstances prior to imposition of the death penalty. After Clemons was found guilty of first degree murder, the State alleged two aggravating circumstances during the penalty phase of his trial: (1) commission of the murder during a robbery for pecuniary gain; and, (2) commission of a murder that was "especially heinous, atrocious or cruel." The jury found both aggravating factors present and that no mitigating circumstances outweighed the aggravating factors. It imposed the death penalty.
The Mississippi Supreme Court affirmed. It acknowledged that the "especially heinous" factor was unconstitutionally vague under Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), but did not require reversal because "when one aggravating circumstance is found to be invalid or unsupported by evidence, a remaining valid aggravating circumstance will nonetheless support the death penalty verdict." Clemons v. State, 535 So.2d 1354, 1362 (Miss.1988).
On certiorari to the United States Supreme Court, Clemons argued that only a jury has the right to impose the death penalty and an appellate court cannot reweigh the balance of factors when the jury has found and relied on an invalid factor. The Court disagreed:
Nothing in the Sixth Amendment as construed by our prior decisions indicates that a defendant's right to a jury trial would be infringed where an appellate court invalidates one of two or more aggravating circumstances found by the jury, but affirms the death sentence after itself finding that one or more valid remaining aggravating factors outweigh the mitigating evidence.
Clemons, 494 U.S. at 745, 110 S.Ct. at 1446.
The Court also found no inconsistencies between appellate re-weighing and its prior Eighth Amendment analysis:
[A] similar process of weighing aggravating and mitigating evidence is involved in an appellate court's proportionality review....
....
We accordingly see nothing in appellate weighing or re-weighing of the aggravating and mitigating circumstances that is at odds with contemporary standards of fairness or that is inherently unreliable and likely to result in arbitrary imposition of the death sentence.
Id. at 749-50, 110 S.Ct. at 1448-49.
In Clemons, only one aggravating circumstance remained valid, namely, that the murder had been committed "during ... a robbery for pecuniary gain." Clemons, 494 U.S. at 742, 110 S.Ct. at 1444. In the instant case, we hold that three valid aggravating circumstances existed, namely, (1) murder committed by a person previously *1034 convicted of a violent felony, (2) murder committed in the course of a felony, and (3) murder committed to avoid arrest.
In Clemons, the defendant's mother and a psychologist presented evidence of mitigating circumstances.[11] In the instant case, Canape did not testify,[12] nor did he call witnesses on his behalf to present mitigating evidence.[13]
We have thoroughly searched the record and find no evidence of mitigating circumstances, even in the case presented by the prosecution. The absence of specific mitigating evidence presented a daunting challenge to Canape's counsel who sought to fill the vacuum by arguing,
If you have reservations or doubts or questions,[[14]] that's a mitigating circumstance. You don't need to number them or articulate them. You don't need to say I think this is a mitigating circumstance. All you have to do is feel it is not appropriate in this case. If you feel uncomfortable about it, if you feel there are questions in your mind doing it, those are mitigating circumstances. That's all it takes. You don't have to find any at all. A best mitigation is your gut feelings.

VIII. Weighing under Nevada law.

We turn now to a consideration of whether our review of mitigating and aggravating circumstances under Clemons requires us to make impermissible findings of fact under Article 6, Section 4 of the Nevada Constitution[15] and NRS 177.025.[16] We conclude it does not.
As Justice Holmes stated in Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918): "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Similarly, while factual determinations are generally associated with trial courts, they are an integral part of appellate proceedings under some circumstances.
As stated in Clemons, 494 U.S. at 748-49, 110 S.Ct. at 1448-49: "It is a routine task of appellate courts to decide whether the evidence supports a jury verdict and in capital cases in `weighing' States, to consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed."
Historically, the Nevada Supreme Court has frequently been called upon to make a *1035 factual determination whether there is substantial evidence to support a verdict. Until relieved of this responsibility by the 1985 legislature, our court routinely engaged in proportionality review of death sentences. This required weighing of aggravating and mitigating evidence. We are still required to weigh evidence in considering whether the death sentence is excessive or the result of passion, prejudice or any arbitrary factor. NRS 177.055.
We conclude, therefore, that a weighing in the instant case pursuant to Clemons does not violate Nevada's Constitution or statutes.
In the case at bar, three aggravating circumstances existed with "no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found." NRS 175.554(2)(c). Accordingly, Canape was death eligible and the jury in its discretion could consider the sentence of death as an option.
Considering the appeal on a harmless error analysis, we reach the same result. Conceding, arguendo, the absence of a factual basis for the depravity of mind instruction, upon review of the entire record we conclude beyond a reasonable doubt that the error was harmless. The record contains no mitigating circumstances. The weight properly accorded to the valid aggravating circumstances made Canape death eligible. The proof of Canape's guilt was overwhelming and, in fact, virtually uncontroverted. We conclude, therefore, that beyond a reasonable doubt, the jury would have reached the same result if depravity of mind had not been included as an aggravating circumstance.
As we stated in Beets v. State, 107 Nev. 957, 965, 821 P.2d 1044, 1050 (1991) (where the depravity of mind instruction was also called into question), "[c]onsidering these circumstances, and the lack of any mitigating circumstances whatsoever, we conclude that the infirm aggravating circumstance based upon depravity of mind is harmless beyond a reasonable doubt." See also Neuschafer v. Whitley, 816 F.2d 1390 (9th Cir.1987).
We further hold that Canape's sentence was not imposed under the influence of passion, prejudice or any arbitrary factor. In addition, we conclude that Canape's sentence of death is not excessive considering both the crime and the defendant.
Accordingly, we affirm Canape's convictions for robbery and murder in the first degree and we affirm Canape's sentence of death.[17]
ROSE, C.J., and STEFFEN, J., concur.
STEFFEN, Justice, concurring:
Although I have joined in the majority opinion, I considered it prudent to respond to our dissenting colleague since he has, for the first time, interjected an assignment of ambiguity to Nevada's statutory scheme for the imposition of capital punishment. With due respect to our colleague, I suggest that he became enthralled with an acorn and thereafter lost himself among the dense leaves and branches of the great tree he had nurtured. The acorn was the willingness of a majority of this court to conclude, beyond a reasonable doubt, that the absence of an invalid aggravating circumstance pertaining to depravity of mind would not have caused the jury to reach a different sentencing verdict. Disenchanted with the majority's "weighing" or "reweighing" of the evidence after accepting the invalidity of the depravity of mind aggravator, the tree became our colleague's labrynthine construct for declaring Nevada's capital sentencing statutes victim to an ambiguity virus.
Our colleague's discovery of a "sequented, two-stage sentencing process" in our capital crime statutes is somewhat belated. In Gallego v. State, 101 Nev. 782, 711 P.2d 856 (1985), cert. denied, 479 U.S. 871, 107 S.Ct. 246, 93 L.Ed.2d 171 (1986), we said:
Under Nevada's sentencing apparatus, the State is first required to prove one or more aggravating circumstances beyond a reasonable doubt. Thereafter, the defendant *1036 may show that the mitigating circumstances revealed by the evidence outweigh the aggravating circumstances proved by the State. Upon such a showing the death penalty is no longer among the sentencing options. See NRS 175.554(2) and (3).
....
The clearly defined, statutorily required, aggravating circumstances that must be found to exist beyond a reasonable doubt serve to narrow and confine the class of persons against whom the death penalty may apply. Individuals who are identified as potential recipients of the death penalty because of conduct statutorily defined as an aggravating circumstance must then be scrutinized according to their individual characteristics. This process is facilitated by consideration of mitigating circumstances and other reliable factors relevant to the life of the defendant as a whole person. Only then may a sentencing authority render an informed judgment based upon the crime and the defendant who committed it.
If the death penalty option survives the balancing of aggravating and mitigating circumstances, Nevada law permits consideration by the sentencing panel of other evidence relevant to sentence. NRS 175.552. Whether such additional evidence will be admitted is a determination reposited in the sound discretion of the trial judge.
Id. at 790-91, 711 P.2d at 862-63 (emphasis added).
Unfortunately, our colleague has stumbled over the term "weighing" as if it were some sort of unusual, perhaps ritualistic exercise that results in the mandatory imposition of the death penalty. Capital trials, from start to finish, require the jury to weigh the State's evidence against the defendant's evidence and the criminal standard of proof beyond a reasonable doubt. And then, despite our colleague's apprehensions to the contrary, the jury may return a non-capital sentence even if the weighing process leaves mitigating factors far short of aggravating factors. This court recently stated with plainness what this court has consistently declared with respect to Nevada's capital sentencing statutes:
Recently, we ... found that the word "may" is commonly understood by reasonable jurors as a permissive word that does not mandate a particular action. Riley v. State, 107 Nev. 205, 217, 808 P.2d 551, 558-59 (1991). Thus the jury was properly informed that the imposition of the death sentence was not compulsory, even if aggravating circumstances outweighed mitigating circumstances. Id[.]; see also Bennett v. State, 106 Nev. 135, 144, 787 P.2d 797, 803 (1990) ("Nevada's statute does not require the jury to impose the death penalty under any circumstances, even when the aggravating circumstances outweigh the mitigating circumstances."), cert. denied, 498 U.S. 925, 111 S.Ct. 307, 112 L.Ed.2d 260 (1991).
Dawson v. State, 108 Nev. 112, 118, 825 P.2d 593, 597 (1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1286, 122 L.Ed.2d 678 (1993).
It is thus seen that this court has consistently recognized the following, straightforward procedure in Nevada's capital sentencing scheme:
1. The State is first required to prove, beyond a reasonable doubt, the existence of one or more statutorily-defined aggravating circumstances.
2. The defendant may demonstrate that mitigating circumstances outweigh their aggravating counterparts, thereby eliminating the death penalty as a sentencing option.
3. If the death penalty option survives steps (1) and (2), the jury remains at liberty to find, after considering all the evidence concerning the defendant, his background and the crime at issue, that the death penalty is not warranted.
To suggest that the above process somehow translates into something other than a weighing process is difficult to understand. Equally obscure is the thought that somehow the weighing process amounts to considerations of "blobs on a scale." Simply stated, under Nevada law, once the State *1037 proves the existence of aggravating circumstances beyond a reasonable doubt (a weighing process for the jury), the jury must then weigh against those death-qualifying factors, all mitigating evidence that tends to disfavor a capital sentence. Whether the defendant is favored by the weighing process or not, the jury is free to return a sentence of life rather than death. I suppose what I am suggesting is that most of what our dissenting colleague now "proposes" has been specifically and consistently held by this court to be the law since the present statutory scheme was enacted.
Shorn of its makeweight, obfuscating argument concerning the extremely belated suggestion of ambiguity in Nevada's capital sentencing statutes, the real burr under our colleague's saddle is this court's "reweighing" of Canape's sentence without the depravity of mind aggravator considered by the jury. Our colleague would prefer that we re-engage the jury machinery to determine Canape's fate under proper instructions. Although I respect the dissent's preference for a reconsideration or "re-weighing" by a jury, I suggest that there are entirely sound and fair reasons for not doing so.
The threshold issue is whether it is constitutionally permissible for this court to affirm Canape's sentence after accepting the proposition that one of the four aggravating circumstances found by the jury is invalid. Justice Young's analysis of this issue is cogent and need not be expanded. Only by way of emphasis do I repeat here what the United States Supreme Court held in Clemons v. Mississippi, 494 U.S. 738, 745, 110 S.Ct. 1441, 1446, 108 L.Ed.2d 725 (1990):
Nothing in the Sixth Amendment as construed by our prior decisions indicates that a defendant's right to a jury trial would be infringed where an appellate court invalidates one of two or more aggravating circumstances found by the jury, but affirms the death sentence after itself finding that one or more valid remaining aggravating factors outweigh the mitigating evidence.
The Clemons ruling makes eminently good sense and clearly vindicates this court's right to reweigh the effect of an invalid aggravating circumstance on Canape's jury-imposed sentence of death.
The second of our colleague's concerns, to which I ascribe total respect, is the capacity of this court, from the cold record, to reweigh or reassess the deliberations of the jury with one of the deliberative components missing, and reach a reliable conclusion. I readily admit at the outset that a re-weighing by this court of a jury-imposed capital sentence should never be viewed as an automatic appellate prerogative. In close cases where the imposition of death is a questionably proper sanction given the individual characteristics and experience of the defendant and the circumstances of the capital offense, I would expect this court to vacate the penalty and remand for a new penalty hearing before a jury. Such is not the case here.
In reassessing Canape's death-worthiness on appeal, I consider it somewhat revealing that the jury found, albeit without lawful foundation, that Canape exhibited:
[a] condition of mind described as depravity of mind ... characterized by an inherent deficiency of moral sense and rectitude. It consists of evil, corrupt and perverted intent which is devoid of regard for human dignity and which is indifferent to human life. It is a state of mind outrageously, wantonly vile, horrible or inhuman.
Jury Instruction No. 8. Although the instruction should not have been given, it nevertheless reveals the jury's view of the quality of Canape's actions in killing his innocent victim. Certainly the prosecutor could have argued from the evidence that Canape's crime reflected the depraved state of mind described in the instruction. I need not repeat in whole or in part the evidence of the offense detailed in Justice Young's opinion. Absent was the drug deal gone sour or any motive for revenge. Canape's crime encompassed the elements of a feigned good Samaritan who was planning and deliberating the murder of the victim he was pretending to succor. The *1038 culmination of Canape's violent and calloused disregard for human life was vividly portrayed by the point blank shot to the head administered to his victim after having first shot him in the back.
Given the fact that Canape provided the jury, and hence this court, with no mitigating evidence, and given the history and seriousness of Canape's misdeeds and the grave circumstances of the instant offense, I have no difficulty in concluding, beyond a reasonable doubt, that the jury would have returned the identical sentence if the depravity of mind instruction had never been given. The remaining three, valid aggravating circumstances amply serve as a solid, just and constitutional basis for this court affirming the penalty of death.
The word "weigh" means "to consider and choose carefully, to balance or ponder in the mind; consider in order to make a choice." Webster's New World Dictionary 1612 (2d ed. 1984). Nevada's capital sentencing law clearly and intelligently directs the jury to weigh the evidence in arriving at a sentencing decision, despite thereafter giving the jury the right to ignore the evidence favoring death and impose a sentence of life. We are required to weigh a complex of factors to fulfill the responsibility enjoined upon us by statute to determine whether a capital defendant's sentence is excessive considering both the crime and the defendant. In a very real sense, irrespective of the invalidity of one or more of several aggravating circumstances, we are required on appeal to reweigh essentially the same factors initially weighed by the jury. Apparently our colleague finds offense in the term "weigh" or "outweigh." I frankly question whether any constitutional decision to impose death could result without the trier of fact weighing all of the alternative considerations bearing on the subject. The process by which an intelligent conclusion is reached in almost all of life's decisions involves a weighing of alternatives. Every aspect of a trial, whether in the guilt or penalty phase, requires a weighing process that precedes and validates any interim or ultimate finding. And, as previously noted, a jury in Nevada, after thoroughly weighing all evidence and information, may simply discard the death-worthiness logic of any such weighing and shun the death penalty for any reason or no reason. The converse, however, is not true. Neither the jury nor this court may disregard a preponderance of mitigating factors to impose or affirm the death penalty.
I have written this concurrence only because I did not want to leave unanswered our colleague's newly found aspect of ambiguity in our capital sentencing statutes. Indeed, our colleague has readily joined with others on the court in affirming numerous death penalty sentences, including Gallego and Dawson, quoted above, without divining ambiguity in our law. As observed above, despite our colleague's exercise in semantics, I perceive nothing new or different in his analysis that would impact Nevada law as interpreted by this court over the years. He would definitely prefer that we give no deference to Clemons, which is his right, and which, as I see it, is the real distillate of his dissent.
I both join and concur in the majority opinion affirming Canape's sentence of death. Moreover, for reasons partially discussed above, I join the majority in the implicit determination that Nevada's statutory scheme is neither ambiguous nor in any sense unconstitutional.
SPRINGER, Justice, concurring in part and dissenting in part:
I concur in the judgment of conviction, but I dissent from the judgment of death.
I dissent because, after studying Nevada's statutory death-sentencing scheme and after reading the present Majority Opinion and other opinions of this court dealing with the death penalty, I have become convinced that no one, including the members of this court, presently understands precisely what juries are required to do in Nevada when they are asked to decide between the death penalty and life imprisonment. Because this court, to date, has been unable to provide any clear and consistent guide to judges, juries, prosecutors or defense counsel as to the correct procedure *1039 for juries to follow in the death-sentencing process, I conclude that Canape has been denied the right of due process of law under our federal and state Constitutions. I would remand for a new death-penalty hearing, at which I would hope that the trial court, under the direction of the supreme court, would be able to give the sentencing jury a clear understanding of how to proceed properly in making the momentous life-death decision.
Under our federal Constitution the need to channel a death-sentencer's discretion is the "fundamental principle" that must ground all state death sentencing statutes; and state statutes must "genuinely narrow the class of persons eligible for the death penalty." Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983); see Godfrey v. Georgia, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). There are two distinct and discrete ways in which states have gone about circumscribing the limited class of persons who may constitutionally be put to death. One way is to limit the sentencer's discretion by setting up a "weighing" procedure whereby the sentencer must arrive at the life-death decision by weighing certain statutorily defined and limited "circumstances." Whether a murder convict is sentenced to life imprisonment or death is determined by this weighing process and by how much weight the sentencer gives to "aggravating circumstances," when weighed against "mitigating circumstances." The sentencer's discretion is limited to the weighing of the two kinds of statutory circumstances against each other. Once the weighing has been done, the sentencer is bound by its calculations; that is to say, if aggravating circumstances are found to outweigh mitigating circumstances, the sentencer must impose death, and if the opposite is true, life imprisonment. States which employ this scheme are called "weighing states."
The other manner in which death-sentencing statutes prescribe the method of sentencing is to allow the sentencer "to exercise unbridled discretion in determining whether the death penalty should be imposed[, but only] after it has found that the defendant is a member of the class made eligible for that penalty by statute." California v. Ramos, 463 U.S. 992, 1009 n. 22, 103 S.Ct. 3446, 3457 n. 22, 77 L.Ed.2d 1171 (1983) (quoting Zant v. Stephens, 462 U.S. 862, 875, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983)). States with such schemes are called "nonweighing states," because the actual life-or-death decision is neither dependent upon nor determined by the weighing of statutory aggravating circumstances against mitigating circumstances. The sentencer's decision in non-weighing states is made in two stages: first, the sentencer follows statutory directions in deciding whether the murder convict is a member of the death-eligible class; and, if this is found, the sentencer has virtually unlimited discretion in making the life-death decision. In a weighing state the sentencer
must weigh the aggravating factor or factors against the mitigating evidence.[[1]]

*1040 By contrast [in non-weighing states] the jury must find the existence of one aggravating factor before imposing the death penalty, but aggravating factors as such have no specific function in the jury's decision whether a defendant who has been found to be eligible for the death penalty should receive it under all the circumstances of the case.
Stringer, ___ U.S. at ___, 112 S.Ct. at 1136.
Whether a state has adopted a weighing or non-weighing death-sentencing scheme is of "critical importance" in reviewing the sentencing process. Id. at ___, 112 S.Ct. at 1137; see Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Whether a weighing or non-weighing approach is established by a state's death-sentencing statutes is of critical importance because the two sentencing methods are so irreconcilably different. A sentencing jury obviously has to be told which of the two methods it is required to employ and whether it is required to weigh one set of statutory circumstances against another or is required to follow the two-stage process of the non-weighing state. "When the jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process." Walton v. Arizona, 497 U.S. 639, 653, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990). A jury cannot properly impose a death penalty without being clearly instructed as to which of the two approaches it is required to employ. Either statutory scheme is fraught with the potential for confusion and misunderstanding[2]; but if the sentencer is confused by the instructions of the court as to whether it is to sentence by weighing statutory circumstances or by engaging in the two-stage, non-weighing process, then serious questions of due process present themselves.
It is difficult not to conclude that Instruction No. 5, taken from NRS 175.554, (set out in the Young Plurality Opinion) was confusing and misleading to the jury. To me it is likely but not at all certain that the jury was misled by the "outweigh" and "based-upon-these-findings" language, discussed in some detail below, into incorrectly engaging in the process of weighing aggravating circumstances against mitigating circumstances as the means of arriving at the death penalty. The real problem, of course, is that it is impossible to tell how the jury read this instruction. It is for this reason, primarily, that Canape is denied due process of law as required by the Due Process Clause and by Article I, Section 8 of the Constitution of Nevada.
There is no way of knowing whether the jury took Instruction No. 5 to mean that it was to arrive at its decision by weighing aggravating circumstances against mitigating circumstances or by the two-stage non-weighing process which I believe is a proper reading of the instruction and of the statute. One reason that I feel safe in saying this is that in the present opinion and in past opinions this court has conflated *1041 the two incompatible death-sentencing approaches. In the Young Plurality, the court incorrectly refers to Nevada as a "weighing state," while the Steffen Concurring Opinion (at page 1036) sets out three conditions which describe perfectly the two-step, non-weighing, death-eligiblity process that I espouse. If a majority of this court cannot tell whether Nevada is a weighing state or a non-weighing state, then I am forced to believe that some trial judges, some jurors, some prosecutors and some defense lawyers must be having the same problem. The Majority writes about "weighing under Nevada law" and the "required weighing of aggravating circumstances" and cites Deutscher v. Whitley, 991 F.2d 605, 606-07, (9th Cir.1993), as authority for the proposition that Nevada is a "weighing state" (Young Opn. at 1032).[3] The Majority relies on Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), which is a Supreme Court review of a weighing state's (Mississippi) death penalty procedures. Then, amazingly, after all this weighing, I see a major heading in the Young Plurality entitled, "Determining death eligibility." Death eligibility is part of the two-stage process in non-weighing states. As Justice Kennedy tells us in Stringer, aggravating factors "have no specific function" in a jury's deciding "whether a defendant who has been found to be eligible for the death penalty should receive it." ___ U.S. at ___, 112 S.Ct. at 1136. It is, of course, true that aggravating circumstances have no specific function in the decision-making process in non-weighing states such as Nevada. I would go on to point out that even if a jury were to weigh some of these circumstances, the jury is not told what to do after it is done weighing. If a jury believed that it was supposed to arrive at its verdict by weighing aggravating circumstances against mitigating circumstances, it would not have the slightest hint as to what it was supposed to do with the result it reached. After the weighing is done then the jury "may" do anything it wants. "What is the point in weighing?", it must ask. That the Majority should write of both weighing and death eligibility in the same opinion brings home to me the profound disorder inherent in our "death penalty jurisprudence."
This is not the first time that this court has muddled the two death sentencing methods, but it is, I must admit, the first time that the enormity of the confusion has dawned on me.[4] For example in Dawson v. State, 103 Nev. 76, 80-81, 734 P.2d 221, 223 (1987), this court addressed the death penalty process as though the decision must be reached by way of weighing statutory circumstances, when it wrote that a death *1042 sentencer must "weigh[] the mitigating circumstances to arrive at a final decision as to whether the defendant shall live or die." 103 Nev. at 80, 734 P.2d at 223. (Emphasis added.) The court in Dawson went on to speak of the "delicate task which the trier of fact has in weighing the mitigating circumstances against the aggravating circumstances." 103 Nev. at 81, 734 P.2d at 224 (emphasis added). This language is pure "weighing state"the sentencer arrives at its "final" decision, a death sentence or a life sentence, through the process of weighing. We find similar "weighing" language in Jimenez v. State, 105 Nev. 337, 343, 775 P.2d 694, 698 (1989), in which we said that "a jury can consider only aggravating circumstances that are grounded in fact and weigh those aggravating circumstances against the mitigating circumstances." (Emphasis added.)
Our case law also lends support to a contrary interpretation, namely, that Nevada is not a weighing state and that the sentencing decision is not "arrived at" through weighing. As pointed out by Justice Steffen in his Concurring Opinion, the case of Gallego v. State, 101 Nev. 782, 711 P.2d 856 (1985), interprets our statutes as being non-weighing and requiring a two-stage process wherein death eligibility is determined first and then the life-death decision is made in the traditional manner without consideration of the statutorily defined aggravating and mitigating circumstances as such. If Justice Steffen sees Nevada as a non-weighing state (and I am not certain whether he does or does not), then I cannot understand his reliance on Clemons, which deals exclusively with weighing of aggravating circumstances against mitigating circumstances in Mississippi, a weighing state. Apparently, he too wrongly thinks that we can be both a weighing and a non-weighing state.
I have concluded that Nevada is a non-weighing state and that sentencers must engage in the two-stage process mentioned above without reference to aggravating circumstances. In saying this I also must add that I think I have an understanding of how the wide-spread confusion between weighing and non-weighing procedures has been generated by the Nevada statute and by the blurry judicial gloss that this court has put upon it. There are two parts of NRS 175.554 that have created confusion among the lawyers in my chambers; and I would wager that these are the sources of confusion elsewhere.
Perhaps the most important source of misunderstanding in our statute is found in NRS 175.554(2)(c), wherein it is provided that a sentencing jury must determine whether aggravating circumstances exist and then, "[b]ased on these findings [as to whether aggravating circumstances and mitigating circumstances "exist"], whether the defendant should be sentenced to life imprisonment or death." This language surely can be read to mean that the sentencing decision must be based in some unspecified way on the existence of statutory aggravating and mitigating circumstances. When one reads the "based-on-these-findings" language in conjunction with the later phrase, "that there are no mitigating circumstances sufficient to outweigh the aggravating circumstances," it is certainly possible to be misled into thinking that the sentencing decision must be "based on" a weighing process. Id. (emphasis added). This is probably why this court mistakenly said in Dawson that the life or death sentence must be "arrived at" through a weighing process.
Notwithstanding the mentioned "based upon" and "outweigh" language, Nevada is not a weighing state. The word "outweigh" is used only with reference to the first, death eligibility stage and has nothing to do with the sentencing process. A death sentencer in Nevada is not required by our statutes to "arrive at" the sentencing decision by weighing but, rather, is entitled to exercise "unbridled discretion" in making that decision.
As I have said before, the uncompromisable distinction between weighing and nonweighing procedures is of "critical importance." One of the reasons that the distinction is so vitally important is that substantially more intense appellate review is called for in weighing states because it is *1043 very hard for a reviewing court to know what to do when one of the "weights," say one of the aggravating circumstances, is removed from the scale. Aside from the harmless error analysis permitted by Clemons, there are only two things the appellate court can do when one of the weights is missing: one is to send the case back to the sentencer to weigh all over again, without the invalidated aggravating circumstance on the scale; the other is to have the appellate court do what it has done in this case, namely, to put on its trial garb and try to "re weigh" all the evidence, making sure that the offending, invalid aggravating circumstances are not permitted on the metaphorical scale. The stated problem of what to do with invalid aggravating circumstances is indeed a problem in weighing states; but it is not a problem in non-weighing states, because death eligibility ordinarily depends on the finding of only one aggravating circumstance.[5] In most non-weighing states, if one of multiple aggravating circumstances found by the sentencer is declared invalid, death eligibility may still be maintained for so long as one aggravator remains intact. See Zant, 462 U.S. 862, 103 S.Ct. 2733.
The Majority's reliance on Clemons clearly has no application in this, or any, non-weighing state because Clemons is a review of the weighing process. Clemons says (incorrectly, I believe) that if a few aggravating circumstances are missing because they have been found in an unconstitutional manner, the appellate court is permitted to fill in the gap simply by reweighing the remaining, valid circumstances and then resentencing the defendant. Such appellate evidence-weighing has no meaning at all in a non-weighing state like Nevada. If the jury did not sentence by weighing, then certainly this court has no business in sentencing by re-weighing; and, as I will explain below, the Majority's attempt to reweigh and thereby resentence Canape was incorrectly executed in a manner contrary to Stringer v. Black, ___ U.S. ___, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992).
If, as I have pointed out, the difference between the two schemesweighing and non-weighingis indeed of "critical importance," then this importance has not been properly recognized in Nevada, and Canape has been denied due process of law.

Nevada's Statutory Scheme
One thing about this case that cannot be challenged is the marked difference of opinion among the justices as to the meaning of our death sentencing statutes. I say that the other justices fail to recognize the "critical importance" of distinguishing between weighing and non-weighing. Justice Steffen says that I am up a tree  that I am "lost ... among the dense leaves and branches of [a] great tree." (Op. at 1035.) If I am indeed lost in a tree, it cannot be denied that I have a lot of arboreal company, including, if I am not mistaken, Justice Steffen and his colleagues in the Majority. The use of the lost-in-a-tree metaphor illustrates, much better than I can, the tangled state of our death-sentencing jurisprudence. Let me, nonetheless, offer for consideration by the bench and bar my own tree-top view of Nevada's death-sentencing statutes:
Nevada's statutes provide for a sequented, two-stage sentencing process. The first stage I would call the "Death-Eligibility Stage"; the second stage I would call the "Death-Imposition Stage." In the death-eligibility stage the jury "narrow[s] the class of persons eligible for the death penalty and ... [thereby] justi[fies] the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant, 462 U.S. at 877, 103 S.Ct. at 2742. The second, death-imposition stage is "an individualized determination on the basis of the character of the individual and the circumstances of the crime." Id. at 879, 103 S.Ct. at 2743.
The Nevada statutes resemble the Georgia, non-weighing death-sentencing scheme rather than that of weighing states such as *1044 Arizona and Mississippi. In Georgia, death-eligibility arises out of a finding of a statutory aggravating factor. Once death eligibility is determined in this way, disallowance of one or more of a number of found statutory aggravators for one reason or another will not in itself abnegate death-eligibility and thus require reversal of the penalty judgment.
In Nevada, the sentencer's finding of at least one aggravating circumstance coupled with a second, necessary finding that aggravating circumstances do not "outweigh" mitigating circumstances, result in the status of death eligibility but do not play a part in guiding the jury in its exercise of life-or-death sentencing discretion (the "death-imposition" process) beyond that of narrowing the class of persons who are to become death-eligible.
NRS 175.554(2)(c) permits the jury to impose a death sentence only (1) "if it finds at least one aggravating circumstance and [2] further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found." The jury is thus required to carry out its decision-making process in two stages. The first stage consists of a determination of death-eligibility by satisfying the two conditions specified in NRS 175.554(2)(c), namely, that the jury find at least one statutory aggravating circumstance and, secondly, that the jury find that mitigating circumstances do not outweigh aggravating circumstances.[6] If the two conditions for death eligibility are found, the jury goes on to the second stage, which is the making of the ultimate life-death decision in the manner that juries have customarily performed this task, by making the essentially moral decision as to whether the murder convict deserves to be punished by death.
The statute does not use the word "weigh." The word "outweigh" is used once, and that is in the concluding, unnumbered paragraph of NRS 175.554(2), where it relates to the establishment of death-eligibility only. There is no other reference in the death-sentencing statute to the concept of "weighing" in relation to the life-death decision-making process. The mentioned, unnumbered paragraph in NRS 175.554(2) tells the jury that a first degree murder convict is eligible for the death penalty only if (in addition to having found a statutory aggravating circumstance) the jury "finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found." (Emphasis added.) As I have said, this is simply a statement of the second of two conditions precedent which must be fulfilled before a jury in a death case can proceed with the imposition stage and its deliberations as to whether a murder convict should be put to death.[7]
Unlike the so-called "weighing states," the jury in Nevada is not compelled to *1045 make the life-death decision on the basis of weighing. The jury in Nevada "may," not must, impose death and then "only" if it finds the two mentioned death eligibility conditions to be present. On the other hand, in weighing states the sentencers are told, more or less explicitly, to impose death if one kind of statutory circumstance outweighs the other.[8]
Under Nevada's death-eligibility scheme, when a defendant has been found by a jury to have committed an "aggravated first degree murder" and is, thus, "death-eligible," the jury may then go on to consider the life-or-death "option" (see Instruction No. 6, discussed in footnote 8). In making the ultimate life-death decision, the jury is not restricted to "weighing" nor is it restricted to "found" aggravating or mitigating circumstances. The jury is entitled to take into account any matter "which the court deems relevant to sentence." NRS 175.552. The sentencer "may appropriately consider character evidence outside the nine areas of aggravating circumstances." Allen v. State, 99 Nev. 485, 488, 665 P.2d 238, 240 (1983). The sentencer may, for example, consider the convict's future dangerousness, Redmen v. State, 108 Nev. 227, 828 P.2d 395 (1992), and may consider what the "person deserves." Dawson v. State, 103 Nev. 76, 80, 734 P.2d 221, 223 (1987). There is obviously much more involved in death-sentencing in Nevada than merely weighing the statutory aggravating and mitigating circumstances that a sentencer has found to exist in a particular case.[9]
The "based upon" language in subsection (c) should be interpreted in a manner that *1046 is not inconsistent with historical practices. This can be done only if we read the "based upon" language to mean that findings relative to statutory aggravating circumstances and mitigating circumstances provide the predicate findings for death eligibility only and not for the ultimate decision as to whether life or death should be imposed.[10] Whether the defendant is eligible for the death sentence (and not whether the death sentence should actually be imposed) is to be based upon the sentencer's findings relative to statutory aggravating and mitigating circumstances. This reading is consistent with my interpretation of the federal and state constitutions, with the statutory death sentencing structure, with NRS 175.552, and with Allen, 99 Nev. 485, 665 P.2d 238.

The Meaning of "Only If It Finds ... That There Are No Mitigating Circumstances Sufficient to Outweigh..."
The second condition of death-eligibility is the jury's finding that mitigating circumstances do not outweigh aggravating circumstances. Once we understand that this phrase does not relate to the ultimate, "final" decision making process, we can go on to inquire as to what the meaning is in the context of death-eligibility.
The jury need not engage in an actual weighing process in order to conclude that aggravating circumstances do not outweigh mitigating circumstances. When I see a small child standing next to a Sumo wrestler, I do not have to weigh them to conclude that the child does not "outweigh" the Sumo wrestler. For example, in a hypothetical case of a vicious torture murder committed by a previously convicted torture murderer, a jury would not be required to engage in a delicate "weighing" in order to come to the conclusion that mitigating circumstances do not outweigh aggravating circumstances. I should think that in almost all deliberate murders this would be more or less the case. Actually, it is not easy to imagine a malicious homicide in which the good "outweighs" the bad. (See footnote 1.)
In the present case, defense counsel presented no evidence in mitigation, and the jury found none. Since there are no found mitigating circumstances, it must follow that mitigating circumstances do not "outweigh" *1047 aggravating circumstance, as long as there remains at least one valid aggravating circumstance. Cf. Nevius v. State, 101 Nev. 238, 251, 699 P.2d 1053, 1061 (1985). It is hard to argue under such circumstances that Canape was not death-eligible. Instead of concluding that Canape was death eligible and that the jury had the discretion to impose the death penalty, the Majority, as I have noted, has decided to resentence Canape by re-weighing the aggravating circumstances and mitigating circumstancesincorrectly so, it would seem.[11]

Conclusion
It is the duty of this court to clarify both the death sentencing statutes and its cases interpreting the statutes. The deadly lack of clarity in our death sentencing scheme is vividly illustrated by the instructions given by the trial court in this case. Instruction No. 6 correctly told the jury that in cases "where the State has established beyond a reasonable doubt that an aggravating circumstance or circumstances exists and the mitigating evidence is not sufficient to outweig[h] the aggravating circumstance," the jury may then "consider the option of sentencing the defendant to death." (Emphasis added.) Instruction No. 5, on the other hand, is taken directly from NRS 175.554 and may have led the jury to believe that the death or life decision must in some unprescribed way be based upon a process of weighing mitigating circumstances *1048 against aggravating circumstances. After reading the Young Plurality, I am forced to conclude that the jurors in this case probably, like the justices in the Majority, do not understand that what they were supposed to do was to satisfy the two death-eligibility conditions, after which, without referring back to the death-eligibility process and without engaging in any additional "weighing" of aggravating and mitigating circumstances, they were free to consider all factors, statutorily-defined and otherwise, in coming to the life-death decision. They may very well have incorrectly believed, as does a majority of this court, that they were supposed to be engaged in some kind of exotic weighing game. There is no way of telling just how the jury read these two instructions.
The main problem with this case is the inescapable confusion that faces juries, judges and counsel in unravelling the death-sentencing statutes. I believe that the confusion and misunderstanding rises to the level of deprivation of life and liberty without due process of law that is prohibited under the Fourteenth Amendment and the Due Process Clause of Article I, Section 8, of the Nevada Constitution. What this court should be doing in this case is to announce a clear declaration that Nevada is a non-weighing state and that the proper procedure for juries and panel sentencers is to engage in the two-stage process discussed above. The trial courts could then design an unambiguous instruction that would instruct death penalty juries on the law of death sentencing. (See suggested instruction, attached.) After the necessary clarification is made, Canape should be given a new penalty hearing that is conducted in accordance with Nevada law, properly understood by the trial court and his new counsel.
Due process has been denied to Canape in the penalty phase of this case; and there is reason to believe that he may have been denied adequate representation of counsel.[12] I would reverse the death penalty judgment and remand the case for a new death penalty hearing, in accordance with the principles stated in this dissent and with the use of an instruction comparable to the form instruction appended to the dissenting opinion.

APPENDIX*

Jury InstructionPenalty Phase
The Defendant, __________________, has been found guilty of first-degree murder. The jury must now decide whether the penalty to be imposed should be life imprisonment with possibility of parole, life imprisonment without possibility of parole, or death. In making this decision, the jury must follow the procedure set out in this instruction.
*1049 Step 1 The jury must first decide whether the prosecution has proved the existence of one or more aggravating circumstances beyond a reasonable doubt. The aggravating circumstances which the prosecution alleges to be present are the following:
[list aggravating circumstances alleged]
The specific aggravating circumstances related to this case are defined in other instructions.
The verdict of the jury that one or more aggravating circumstances exists must be unanimous. If the jury finds that no aggravating circumstances are present, it cannot impose the death penalty and must proceed to consider whether life imprisonment without possibility of parole or life with possibility of parole is the proper sentence.
Step 2 If the jury finds that the existence of one or more aggravating circumstances have been proved beyond a reasonable doubt, it must determine whether mitigating circumstances exist which are sufficient to outweigh the aggravating circumstance or circumstances. In this step you are allowed to consider only the aggravating circumstances found in Step 1 against the mitigating circumstances of which evidence has been presented. A mitigating circumstance includes any fact which a juror believes makes the appropriate sentence a sentence less than death.
If the jury unanimously concludes the mitigating circumstances outweigh the aggravating circumstances, a sentence of death cannot be imposed, and the jury should proceed to consider whether the appropriate sentence is life imprisonment without possibility of parole or life imprisonment with possibility of parole. (Step 4)
If the jury finds that the mitigating circumstances do not outweigh the aggravating circumstances, then and only then may it consider whether a sentence of death is the proper sentence. (Step 3)
Step 3 If the jury finds that one or more aggravating circumstances are present and that the mitigating circumstances do not outweigh the aggravating circumstances, the jury must then decide which of the possible penalties is the proper sentence in the case, considering the nature of the crime and the character and background of the defendant. In making this determination, you do not weigh aggravating or mitigating circumstances against one another; rather, it is your duty to review all of the evidence which has been presented to you on the issue of the proper penalty, and make a reasoned moral choice whether a death sentence, or a sentence less than death, should be imposed in this case.
The jury is never required to impose a death sentence, and no juror is ever required by law to vote in favor of a death sentence. In considering the evidence relevant to the proper sentence, you must not consider any evidence which was not admitted or was ordered stricken by the court.
In order to impose a sentence of death, your vote must be unanimous.
Step 4 If you decide not to impose the death penalty, you must then decide whether the appropriate penalty is life imprisonment without the possibility of parole or life imprisonment with the possibility of parole. In making this determination, you must consider all the evidence presented which is relevant to the appropriate penalty.
NOTES
[1] The instruction in question read as follows:

A reasonable doubt is one based on reason. It is not mere possible doubt but is such doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual and substantial, not merely a possibility of [sic] speculation.
[2] Instruction No. 7 reads as follows:

You are instructed that the following factors are circumstances by which Murder of the First Degree may be aggravated:
(1) The murder was committed by a person who was previously convicted of a felony involving the use or threat of violence to another, to-wit: Robbery With Use of a Deadly Weapon in Case No. C86093 in the Eighth Judicial District Court of the State of Nevada in and for the County of Clark.
(2) The murder was committed while the person was engaged in the commission of or an attempt to commit any robbery.
(3) The murder was committed for the purpose of avoiding or preventing a lawful arrest.
(4) The murder involved depravity of mind.
[3] An investigator testified that on arriving at the crime scene, he checked Toledo's car and found the emergency light switch on and a dead battery.
[4] Jerry Cohen, owner of the liquor store held up by Canape seventeen days later, said that Canape "stuck a gun in my face and backhanded me in the eye."
[5] We note, however, that Stringer v. Black, ___ U.S. ___, ___, 112 S.Ct. 1130, 1136, 117 L.Ed.2d 367 (1992), requires this court, in affirming Canape's conviction, to analyze the role the invalid aggravating factor played in the sentencing process. After a thorough examination of the entire record, and given that Canape presented no mitigating circumstances and considering the other valid aggravating factors, we conclude that the arguably invalid depravity of mind aggravating circumstance was not a significant factor in the sentencing process.
[6] Canape's counsel admitted in the penalty argument to the jury that two aggravating circumstances existed, saying: "You found him guilty of robbery. That gave the state an aggravating circumstance to seek the death penalty[.] [T]he judgment of conviction on ... the robbery that occurred after the robbery/murder ... [t]hat's another aggravating circumstance. Those have been proved beyond a reasonable doubt."

In this decision, we hold there was a third aggravating circumstance, namely, that the murder was committed to avoid a lawful arrest.
[7] The instructions read as follows:

INSTRUCTION NO. 4:
The jury shall fix the punishment at:
(1) Death, or
(2) Life imprisonment without the possibility of parole,
or
(3) Life imprisonment with the possibility of parole.
INSTRUCTION NO. 5:
The State has alleged that aggravated circumstances are present in this case.
The defendant has alleged that certain mitigating circumstances are present in this case.
It shall be your duty to determine:
(a) Whether an aggravating circumstance or circumstances are found to exist; and
(b) Whether a mitigating circumstance or circumstances are found to exist; and
(c) Based upon these findings, whether the defendant should be sentenced to life imprisonment or death.
The jury may impose a sentence of death only if it finds at least one aggravating circumstance has been established beyond a reasonable doubt and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.
Otherwise, the punishment imposed shall be imprisonment in the State Prison for life with or without the possibility of parole.
INSTRUCTION NO. 6:
You are instructed that it is not necessary for the defendant to present any mitigating circumstances. Even if the State establishes one or more aggravating circumstances beyond a reasonable doubt and the defendant presents no evidence in mitigation you should not automatically sentence the defendant to death. The law never specifies that a sentence of death is appropriate; the jury however may consider the option of sentencing the defendant to death where the State has established beyond a reasonable doubt that an aggravating circumstance or circumstances exists [sic] and the mitigating evidence is not sufficient to outweight [sic] the aggravating circumstance.
[8] The explanation prompted Canape's attorney to comment at the beginning of his argument:

I guess I should thank [the prosecutor]. Because the first ten, fifteen minutes of the argument I agreed with him. He really set it out for you as to the death penalty when you are able to and not able to and everything. That saves me time. I can talk about other things. It was a very good explanation of aggravating and mitigating and how it all works.
[9] The instructions read as follows:

INSTRUCTION NO. 10:
Murder of the First Degree may be mitigated by any circumstance you deem appropriate, even though the mitigating circumstance is not sufficient to constitute a defense or reduce the degree of the crime.
INSTRUCTION NO. 10A:
Murder of the First Degree may be mitigated by any of the following circumstances, even though the mitigating circumstance is not sufficient to constitute a defense or reduce the degree of the crime:
(1) The defendant has no significant history of prior criminal activity.
(2) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.
(3) The victim was a participant in the defendant's criminal conduct or consented to the act.
(4) The defendant was an accomplice in a murder committed by another person and his participation in the murder was relatively minor.
(5) The defendant acted under duress or under the domination of another person.
(6) The youth of the defendant at the time of the crime.
(7) Any other mitigating circumstances.
[10] Despite our ruling in the instant case, we emphasize that we expect vigilance on the part of our prosecutors in assuring that only aggravating circumstances that are clearly warranted by the evidence are presented for consideration by the trier of fact.
[11] The United States Supreme Court vacated the Mississippi Supreme Court judgment and remanded the case on the ground that the opinion was virtually silent with respect to the mitigating evidence and how the jury considered that evidence. Clemons, 494 U.S. at 752, 110 S.Ct. at 1450.
[12] The court personally canvassed Canape in both the guilt and penalty phases to verify that he did not want to testify.
[13] During argument on appeal, this court inquired as to why no mitigating evidence whatsoever was presented. Canape's counsel, one of Nevada's most experienced capital case defense lawyers, replied,

Mr. Canape didn't give us the information we needed for an investigation. He was from out of state, had lived in several places and we had no information we could trace to talk to family members or obtain records or anything else. I believe he was from Jamaica and there was no way of contacting people there, and he lived in some other places. The contacts we attempted to make did not pan out. That is why there is nothing there other than what I argued in my closing argument.
[14] Apparently the jury entertained no doubts about Canape's guilt and had no questions. It took slightly less than two hours to return the guilty verdict. Eight days later in the penalty phase, the hearing started at 11:05 a.m. The State's evidence consisted largely of the testimony of Jerry Cohen, whose liquor store Canape robbed seventeen days after Toledo's death, and an authenticated copy of Canape's Hawaii conviction in 1983. The case was submitted to the jury at 12:35 p.m. and the verdict returned at 3:20 p.m.
[15] Article 6, Section 4 reads in part: "The supreme court shall have appellate jurisdiction in all civil cases arising in district courts, and also on questions of law alone in all criminal cases in which the offense charged is within the original jurisdiction of the district courts."
[16] NRS 177.025 provides: "The appeal to the supreme court from the district court can be taken on questions of law alone."
[17] The Honorable Miriam Shearing, Justice, did not participate in the decision of this matter.
[1] I maintain throughout this dissent that Nevada is not a weighing statethat is to say, our statutes do not tell juries to arrive at their decision just by weighing statutory "factors" against each other but, rather, by a discretionary process in which all evidence relating to the murder and the murderer are considered. The Nevada, "non-weighing" sentencing method is far superior to a weighing scheme for a number of reasons. I seriously doubt whether mitigating circumstances ever outweigh aggravating circumstances in a case of malicious, deliberate first degree murder. I believe that when juries refuse to impose the death penalty in weighing states, they do so for the same reason that they do so in non-weighing states, because they do not believe the defendant deserves to die, and not because of some sort of incomprehensible "weighing" activity on their part. I do not believe that a jury is capable of isolating and weighing the weight entities represented by these statutory factorsdiscrete little weight blobs that must be put on a metaphorical scale by juries either on the life side or on "death's side of the scale." Stringer v. Black, ___ U.S. ___, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 367 (1992). My point was very well put by Justice Harlan in McGautha v. California, 402 U.S. 183, 204, 91 S.Ct. 1454, 1465, 28 L.Ed.2d 711 (1971):

To identify before the fact those characteristics of criminal homicides and their perpetrators which call for the death penalty, and to express these characteristics in language which can be fairly understood and applied by the sentencing authority, appear to be tasks which are beyond present human ability.
[2] It should be apparent to any reader of this dissent that no one really understands what all this "weighing" is about. There is a growing body of social science data relative to jury confusion created by present-day death sentencing statutes. See, e.g., Hans Zeisel, Jury Surveys: Comprehension of Death Penalty Application (April 1990; January 1992), quoted in United States ex rel. Free v. Peters, 806 F.Supp. 705, 732 Appendices A & B (N.D.Ill.1992). These studies indicate that there is much need for greater clarity of instructions in death cases.

In his concurring opinion in Walton, in discussing what he saw as being two contradictory positions being taken by the Supreme Court in death cases, Justice Scalia remarked: "An observer unacquainted with our [the Supreme Court's] death penalty jurisprudence (and in the habit of thinking logically) would probably say these positions cannot both be right." 497 U.S. at 656, 110 S.Ct. at 3058 (Scalia, J., concurring in part and concurring in the judgment). I suggest that one who is in the habit of thinking logically would probably say, in this case that the two positions (weighing and non-weighing) "cannot both be right."
In the assumption that juries do not and cannot understand instructions as they are now being given, I have presumed to construct a "plain English" instruction that would incorporate the step-by-step, death-eligibility interpretation of the death sentence statutes. I have attached this instruction as an appendix to this dissent.
[3] It is worth noting that the Young Plurality cites to Neuschafer v. Whitley, 816 F.2d 1390 (9th Cir.1987), relative to the consequences of an invalid aggravating circumstance. Neuschafer is written in the assumption that Nevada is a non-weighing state. The Neuschafer court observed that Neuschafer had offered "no distinction between his case and the circumstances in Zant v. Stephens, and we can find none." Id. at 1393. If there is no distinction between the Neuschafer case and Zant, (a proposition with which I heartily agree), then, Nevada is, as I have insisted, a non-weighing state. As I discuss below, Zant is a non-weighing, two-stage, death-eligibility case in which aggravating circumstances "have no specific function," once death eligibility is determined. Stringer, ___ U.S. at ___, 112 S.Ct. at 1136.
[4] Further indication of the confusion of which I speak is evidenced by a recent law review article in which Nevada is listed as a "weighing state," based on NRS 200.030(4)(a). Christian D. Marr, Criminal Law: An Evolutionary Analysis of the Role of Statutory Aggravating Factors in Contemporary Death Penalty Jurisprudence  From Furman to Blystone, 32 Washburn L.J. 77, 99 n. 127 (1992). This statute provides that "[e]very person convicted of murder of the first degree shall be punished: (a) By death, only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances." NRS 200.030(4)(a) (emphasis added). The author of the article apparently took the word "shall" (which is an apparent contradiction to "may impose a sentence of death" employed in NRS 175.554(2)) to indicate that sentencing was arrived at through weighing and that we were a weighing state. The use of the word, "only," however, indicates that the sentencer must satisfy certain conditions and shall sentence to death only when the conditions are met. The Majority justices are not the only ones who are confused by our death-sentencing statutes.
[5] As noted in the text, Nevada has two death eligibility requirements, the finding of at least one aggravating circumstance and the negative finding that mitigating circumstances do not outweigh aggravating circumstances.
[6] The cited clause provides for a second, additional condition for death-eligibility and has nothing to do with the actual life-death decision. After finding the presence of an aggravating circumstance, the sentencer must go on to assure itself that mitigating circumstances do not outweigh aggravating circumstances  that the good news not outweigh the bad. In most cases this will not involve a delicate process of measuring factors that favor death against those which do not. As in many situations in which one item is weighed against another, it will be quite obvious in many, if not most, instances that an aggravated murder does not involve "mitigating" circumstances which will overcome the evil inherent in an intentional killing of a human being. Actually, it seems to me that this second condition, assurance that the good does not outweigh the bad, affords very little protection to murderers insofar as the preliminary death-eligibility determination is concerned. If the clause in question is to be assigned any significance, it can only be that the sentencer must be convinced preliminarily that the subject murder does not involve such ameliorating and mitigating factors as to overcome or "outweigh" the evil inherent in the murder. I suspect that if such a condition truly existed, the convicted murderer would not have been found guilty of aggravated murder in the first place.
[7] The two conditions for death-eligibility were created in 1977 to conform with the constitutional need for "channeling and limiting ... the sentencer's discretion in imposing the death penalty," which has been recognized by the Supreme Court as a "fundamental constitutional requirement." Maynard v. Cartwright, 486 U.S. 356, 362, 108 S.Ct. 1853, 1857, 100 L.Ed.2d 372 (1988). In Nevada, once the two statutory conditions are met, the convict becomes "death-eligible." As put in Instruction No. 6 given to the jury in this case, the sentencer "may consider the option of sentencing the defendant to death where the State has established beyond a reasonable doubt [the two conditions] that an aggravating circumstance or circumstances exists and the mitigating evidence is not sufficient to outweig[h] the aggravating circumstance." The jury may very well have read Instruction No. 6 as requiring the kind of two-step, death eligibility approach that I believe our statute demands; however, in Instruction No. 5, the court uses the statutory language of NRS 175.554(2)(c), "[b]ased upon these findings, whether the defendant should be sentenced to life imprisonment or death." This statutory language, as discussed in the text, absent very careful and in-depth analysis, leads very easily to the conclusion that the jury is required to arrive at its life-death decision strictly by means of weighing aggravating circumstances against mitigating circumstances. Again, we have no idea of how juries might be reading the two different, and probably contradictory, instructions.
[8] For example, in Arizona, the death sentencer "shall impose a sentence of death" if the sentencer "finds one or more of the aggravating circumstances ... and that there are no mitigating circumstances sufficiently substantial to call for leniency." Ariz.Rev.Stat.Ann. § 13-703(E) (1989) (emphasis added). The Arizona Supreme Court reads the second, "sufficiently-substantial" requirement to mean that the sentencer must "weigh" aggravating circumstances against mitigating circumstances. This being the case, "weighing" becomes the integral, mandatory essence of the death-sentencing process in Arizona. The sentencer has no discretion and "shall" sentence to death when it finds one or more aggravating circumstances and, secondarily, weighs the aggravating circumstances and the mitigating circumstances and finds that the mitigating circumstances do not weigh enough to call for leniency. Once an aggravating circumstance is found, the Arizona sentencer sets about "weighing" circumstances; and if the mitigating circumstances do not weigh-up to the aggravating circumstances, a death verdict must be returned.

It is important to note that Nevada's scheme is much different from Arizona's. The Nevada sentencer is not required to return a death sentence even in the presence of a found aggravating circumstance and even if that circumstance outweighs mitigating circumstances. Unlike Arizona, the death sentencing decision in Nevada is strictly a discretionary decision. The jury "may" consider all relevant factors, even undefined, unspecified "aggravating circumstances" that go beyond those listed in the statute. NRS 175.552. Nevada could not, under its discretionary sentencing scheme, be saying: "You, sentencer, are free to weigh statutorily-defined aggravating circumstances, undefined aggravating circumstances, statutorily-defined mitigating circumstances and undefined mitigating circumstances; and, when you come up with their weights, based on that measurement alone, you `may' somehow `arrive at' a life or death decision." This does not make sense. It does not make sense, either, to think that in Nevada, where the sentencer is given total discretion in making the death-decision (subject to the two conditions discussed in the text), "weighing" has anything to do with the actual, final decision as to whether to impose a death or life imprisonment penalty. It makes even less sense to say that in Nevada the sentencer must "arrive at" the death decision purely through some kind of "weighing" mechanism.
[9] As I see it, the only way that one can conclude that death-sentencing is equated to statutory circumstance-weighing is by a rather contorted reading of lettered subparagraphs (a) and (b) of NRS 175.554(2). Subparagraphs (a) and (b) simply require the sentencer to determine "[w]hether" aggravating or mitigating circumstances "exist." (Emphasis added.) Subsection (c) states that "[b]ased upon these findings" (that is, the findings required by (a) and (b) as to whether there are any aggravating circumstances or mitigating circumstances), the sentencer is to determine "whether the defendant should be sentenced to life imprisonment or death." Subsection (2)(a), (b) and (c) can be paraphrased in this way: "The sentencer shall determine whether aggravating or mitigating circumstances exist and `based on these findings' (as to whether such circumstances exist) decide whether the defendant should be sentenced to death or not." This reading of the statute, however, makes no sense. A mere finding as to whether such circumstances exist is not of any consequence; so to make any sense out of it we have to read it to mean: "The sentencer shall decide whether aggravating or mitigating circumstances exist and based upon the aggravating and mitigating circumstances found by the sentencer decide whether the defendant should be sentenced to death or not." This is not to say that we arrive at the death sentence by weighing. It does seem to say that the sentencer must base its decision on found aggravating and mitigating circumstances, and we know from NRS 152.552 and from the cases cited in the text that the sentencer may go beyond the found statutory circumstances in making the life-death decision. No matter how I read the statute, I cannot read it to mean that a jury must arrive at the death decision strictly through the process of weighing found aggravating circumstances against mitigating circumstances.
[10] I note that in Mississippi, called by the Supreme Court a "weighing state," the statute contains "based upon" language similar to ours; however, the phrase is used in a different context, and because it follows directly after a clause relating to mitigating circumstances outweighing aggravating circumstances, it comes a lot closer to making Mississippi a weighing state than does our statute. My own reading of the Mississippi statute tells me that even giving account to the differences between our own statute and theirs, it is arguable that Mississippi is not really a weighing state either. Even if our statute were identical to Mississippi's, I would argue that we are not a weighing state; however, as our statute presently reads, it is quite clear that juries are not required to arrive at the life-death decision by weighing.
[11] The Young Plurality declares on behalf of a majority of this court that the court "elect[s] to re-weigh aggravating circumstances against evidence of mitigating circumstances." If the Majority is serious about re-weighing the evidence in this case, it is required to make a "thorough analysis of the role an invalid aggravating factor played in the sentencing process." Stringer v. Black, ___ U.S. ___, ___, 112 S.Ct. 1130, 1136, 117 L.Ed.2d 367 (1992). The only "analysis" that I can find in the Young Plurality is the assurance that the good justices made a "thorough examination of the entire record." This is entirely possible, but it is certainly not of much help to me or to the defendant in trying to divine just what kind of an analysis resulted from the justices' supposed "thorough examination of the entire record." As I see it, the Majority evades the entire problem by refusing to tell us whether or not one of the aggravating circumstances was invalid, by announcing that the "arguably invalid" aggravating circumstance was "not a significant factor in the sentencing process." Was it invalid or not? If the factor was invalid, why was it not significant? A very disappointing, if not nonexistent, analysis, I should say. If the Majority is bent on resolving this case by re-weighing, an adequate treatment of how these measurements were made would require the court to discuss and analyze in detail all of the evidence presented during this trial in order to come to a rational conclusion as to the effect of the invalid factor erroneously placed before the jury in this case. See Clemons v. Mississippi, 494 U.S. at 751-52, 110 S.Ct. at 1449; see also Parker v. Dugger, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991) (state court deprived capital defendant of "individualized treatment to which he is entitled under the Constitution" by failing to conduct independent review of evidence, ignoring evidence of mitigating circumstances, and misreading trial judge's findings; case remanded for meaningful appellate review, pursuant to Clemons, with instructions to re-weigh evidence or conduct harmless error analysis).

There is another error in the way that the Majority claims to have re-weighed the evidence in this case. Stringer requires, in cases of appellate re-weighing, that in addition to making a "thorough analysis," the "court must determine what the sentencer would have done absent the factor." Stringer, ___ U.S. at ___, 112 S.Ct. at 1137. The Majority has failed to engage in this required guessing game. According to Stringer, when the trial court sentencer has been improperly "told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale." ___ U.S. at ___, 112 S.Ct. at 1137 (emphasis added). The Majority is required by Stringer to make a ruling as to what the sentencer would have done absent the two aggravating circumstances found to be invalid. It did not do this. For this reason also, the Majority's resentencing in this case should be nullified on federal constitutional grounds. Canape's death sentence has now become an appellate court "resentence" imposed by appellate judges, casually and without analysis, and without making the determination required by Stringer of what the jury might have done had it not considered the "invalid factor." Perhaps it is idle to point out these failings in the Majority Opinion because it is so clear that neither the jury nor this court should be sentencing Canape by weighing aggravating circumstances against mitigating circumstances; still, if the Majority is treating Nevada as a weighing state, it should have gone about it correctly and in accordance with federal constitutional law. As it stands, the death sentence that this court has decided to impose on Canape cannot withstand federal constitutional scrutiny.
[12] In a penalty hearing, defense counsel will ordinarily make an effort to show that the murder convict is not death eligible and that if he/she is, then the convict does not deserve to be punished by death. There are three things, then, that defense counsel can do:

1. Show that there are no aggravating circumstances.
2. Show that mitigating circumstances outweigh aggravating circumstances.
3. Plead for mercy.
With regard to the second task, trying to show that mitigating circumstances outweighed aggravating circumstances, defense counsel did nothing. After apologizing to the jury for not showing up at the time the guilty verdict was returned and for not "being organized like I wanted to be," defense counsel told the jury that he would be presenting "no evidence of mitigation" because such evidence was not "necessary." The "best mitigation," defense counsel told the jury, was "your gut feelings." It seems to me that there ought to be something good that a defense lawyer can say about anyoneeven a first degree murderer. Here, counsel appears to have gone out of his way to avoid anything good coming out about his client.
With regard to counsel's elemental obligation to plea for his client's life, all I can find in the record is little more than counsel's telling the jury, "if you want to impose the death penalty in this case, you can."
Understandably, the public defender's office, which handled this appeal, did not take to task the public defender who tried this case, so the matter of adequate counsel is not a part of this appeal. I would not be of a mind to send this case back for a new penalty hearing without giving defense counsel a chance to explain. Perhaps the quoted phrases will be seen as being out of context; nevertheless, it is clear to me that private counsel should be appointed for Canape and that this subject matter be explored at the trial court.